LILLIAM TORRES, asistida de su esposo EFRAÍN SOTO y la SOCIEDAD LEGAL DE GANANCIALES compuesta por ellos, demandantes y recurridos, *v.* MUNICIPIO DE MAYAGÜEZ, demandado y recurrente.

*Número:* R-81-104      *Resuelto:* 19 de junio de 1981

*Parra, Del Valle & Frau,* abogados del recurrente; *Miguel Hernández Colón* y *Celedonio Medín Lozada,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Mediante orden de mostrar causa revisamos la sentencia del Tribunal Superior, Sala de Mayagüez declarando con lugar una demanda presentada contra el Municipio de Mayagüez por las lesiones sufridas por la Sra. Lilliam Torres como consecuencia de una caída en una acera, bajo la alegación central de negligencia consistente en que el Municipio demandado "había comenzado a construir una depresión o bajada en el nivel de la acera, dejándola al descubierto, sin pintarla de amarillo (como luego de dicho accidente lo hizo); y sin cubrirla con una tapa u objeto protector alguno, ni habiendo colocado aviso, valla o advertencia de peligro"; y sin adoptar "las precauciones necesarias para proteger la seguridad de los transeúntes".

Dicho dictamen se produjo a la luz de los siguientes hechos, según estimados probados:

3. Para la fecha en que ocurrió el accidente que motiva esta acción, el demandado Municipio de Mayagüez, estaba construyendo, por primera vez, un sistema de rampas en sus aceras, con el laudable propósito de facilitar el acceso a las mismas por personas con impedimentos físicos, e.g., aquellas que transitan en sillas de ruedas.

4. El día 19 de noviembre de 1977, *alrededor de la diez de la mañana,* los demandantes caminaban, junto a sus hijos,

por la acera [de aproximadamente seis pies de ancho] de la calle Peral que está al lado oeste de la Plaza de Colón en la ciudad de Mayagüez. En esa ocasión, y al acercarse al lugar del accidente, la demandante Lilliam Torres, quien calzaba zapatos de tacos bajos, de los conocidos por sandalias, caminaba al frente con uno de sus hijos por el lado exterior de la acera, mientras que el demandante Efraín Soto iba, junto a sus otros dos hijos, inmediatamente detrás de ella.

5. En el lugar donde ocurrió el accidente, en dicha acera de la Calle Peral, el demandado había comenzado a construir una rampa para lisiados. Esa rampa consistía de una depresión que se extendía de una faja de ancho menor originado en el interior de la acera, inclinada —a manera de declive— hacia el borde de la misma donde el ancho era de aproximadamente tres pies. Dicha rampa o depresión no estaba pintada ni tampoco había allí aviso, señal o indicación alguna que advirtiera a los transeúntes de la condición existente.

6. Al momento de ocurrir el accidente objeto de la presente reclamación, había un automóvil estacionado perpendicularmente a dicha rampa o depresión y su frente cubría hasta ocultar como un pie de la misma.

7. Al llegar al lugar del accidente, la demandante Lilliam Torres cayó sobre la superficie de la rampa o depresión en la parte céntrica de la misma ...

12. La rampa donde ocurrió el accidente no estaba en esos momentos, en condiciones de razonable seguridad. No había en la misma aviso, señal o indicación alguna que advirtiera al transeúnte de la condición allí existente. Fue con posterioridad al accidente que, a manera de aviso o advertencia a los transeúntes de la existencia de dicha rampa, el demandado ordenó que la misma fuera pintada de amarillo.

De los antecedentes fácticos expuestos se desprende que el foro de instancia basó su conclusión de responsabilidad en dos factores, a saber: (a) que la rampa no estaba pintada; y (b) ausencia de aviso expreso sobre su existencia. Erró.

## I

Tomamos conocimiento judicial de que la génesis estatutaria sobre construcción de rampas o bajadas adecua-

das (*curb ramps*), para que personas inválidas en sillas de ruedas puedan cruzar las calles y avenidas en forma segura y conveniente, es la Sec. 228 de la Ley Pública Federal #93–87 del 13 de agosto de 1973. La disposición de ley requiere que desde el 1 de julio de 1976 se provean dichos accesos en cualquier paso de peatones cuando se vaya a construir o reconstruir aceras financiadas por fondos federales, bajo sanción de suspenderse tales fondos al no ser el proyecto aprobado por el Secretario de Transportación de los Estados Unidos. La reglamentación de las especificaciones físicas de tales rampas quedan en manos de cada localidad, de acuerdo a las necesidades del sitio en particular. (Aviso FHWA 5040.1 del 8 de marzo de 1974.)

El Estado Libre Asociado de Puerto Rico, como participante y recipiente de fondos federales para la construcción y reconstrucción de sus carreteras, a través del Departamento de Transportación y Obras Públicas, la Autoridad de Carreteras y la Junta de Planificación[1] comenzó hace algún tiempo a coordinar e implementar uniformemente dicho mandato —en sus respectivas áreas jurisdiccionales— y en los municipios del país.

■ Como consecuencia, las características generales y básicas de este tipo de rampa destinada a facilitar el movimiento de sillas de personas físicamente incapacitadas —cuya presencia se ha hecho familiar a todo transeúnte en nuestras ciudades principales— son como sigue: comienzan en parte del interior del nivel de la acera correspondiente, y en forma moderada de pendiente o declive, su superficie continúa hacia la parte más inferior del borde exterior de

---

[1] Mediante la Resolución Núm. 221 de 24 de marzo de 1976, la Junta de Planificación adoptó como norma a implementarse por la Administración de Reglamentos y Permisos (ARPE), para regir en la construcción de aceras y nuevas urbanizaciones y calles independendientes, el exigir que tales rampas "se construirán en las esquinas formadas por intersecciones de calles o los sitios estratégicamente seleccionados". La guía flexible admite pues, que se ubique fuera de las esquinas, armonizándola con alguna obra de alcantarillado pluvial, alumbrado público y otras situaciones.

esa acera y termina en el sardinel. Aunque de menor extensión y anchura, se asemeja a las entradas corrientes que hay para vehículos de motor a residencias y otros lugares. Una rampa de este tipo, al contrastarse peculiaridades físicas con otras construcciones presentes en el panorama de muchas de las aceras del país refleja que: (a) es una perceptible a simple vista y sin mayor esfuerzo; (b) per se no representa una condición inherentemente peligrosa; y (c) no requiere se provean avisos sobre su existencia.

◼ Sobre la pintura amarilla de su superficie o bordes de la misma, es menester señalar que aunque ciertamente ello lo hace más visible y evidente al ojo humano, en particular durante horas de la noche, conforme la Sec. 5-903 de la Ley de Vehículos y Tránsito de Puerto Rico, según enmendada, [2] tal medida es una señal de tránsito puramente de carácter regulatorio, con la finalidad de avisar su existencia y prohibir a los conductores de vehículos que la obstruyan mediante estacionamiento conflictivo a su uso. No es por tanto una especificación dirigida a la salvaguarda del peatón, aun cuando incidentalmente le sirva para notarla.

## II

◼ En el caso de autos, los hechos considerados por el tribunal de origen tienden a indicar que la rampa en questión estaba terminada. Sólo faltaba el pintarse de amarillo. Por las características físicas descritas previamente era o debió ser visible a la demandante Sra. Torres. Debido a la hora en que ella se cayó —plena luz del día— podemos inferir dos posibles razones para que no se percatara de la misma; que no la advirtió porque venía totalmente ajena y

---

[2] En lo pertinente dispone que los "conductores de vehículos obedecerán en todo momento las marcas del pavimento o encintado . . . e igualmente se abstendrán de estacionarse, pararse o detenerse frente a un encintado pintado de amarillo". 9 L.P.R.A. sec. 1075.

despreocupada o que el automóvil temporalmente estacionado frente a la rampa se lo impidió. Bajo cualesquiera de esas alternativas opinamos que el Municipio recurrente no es responsable.

■ Recuérdese que si bien un peatón no está obligado a constantemente ir mirando hacia la superficie, ciertamente debe evitar el caminar ajeno a aquellas situaciones visibles a su perspectiva visual. La situación es análoga al cuidado normal que se requiere para evitar chocar con un rótulo de tránsito instalado dentro de una acera en forma vertical o el sufrir una caída al pasar de la superficie del pavimento de la carretera hacia el nivel más alto de la acera sin tropezar con su borde. No encontramos fundamento jurídico para sostener la sentencia, excepto bajo la teoría de responsabilidad absoluta municipal, la cual obviamente resulta inaplicable. *Oliver* v. *Municipio de Bayamón*, 89 D.P.R. 442 (1963).

*Se expide el auto y se dictará sentencia revocando la del Tribunal Superior, Sala de Mayagüez de 20 de enero de 1981.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Martín concurrieron en el resultado sin opinión. El Juez Asociado Señor Irizarry Yunqué emitió opinión disidente.

—O—

Voto disidente del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 19 de junio de 1981

Disiento. Es laudable el propósito de facilitar a las personas lisiadas que se ven obligadas a moverse en sillones de ruedas, que las aceras les provean un acceso menos incómodo para subir y bajar desde la calle. Pero no veo diferencia entre la depresión en la acera, voluntariamente creada por un municipio con ese propósito, y la depresión que se crea negligentemente, haciendo la acera

menos segura para los peatones y propiciando accidentes como el que aquí nos ocupa. Es previsible que una persona desapercibida de la existencia de tales depresiones pueda sufrir un accidente y lesionarse seriamente. El municipio tenía la obligación de tomar medidas adecuadas para advertir del peligro, y no lo hizo. *Oliver* v. *Municipio de Bayamón*, 89 D.P.R. 442 (1963); *Del Toro* v. *Gob. de la Capital*, 93 D.P.R. 481 (1966).

Considero, por otra parte, que habiendo ocurrido el accidente en horas del día, pudo ser evitado por la señora Torres de Soto si hubiese estado mirando por donde caminaba. Desafortunadamente, es un hecho de todos conocido en nuestro país que las aceras de las calles de nuestros pueblos y ciudades no son modelo de seguridad. A la existencia de condiciones peligrosas como la rampa de este caso tendrá que acostumbrarse la ciudadanía, y caminar más alerta para evitar caer en esta especie de trampas.

A mi juicio debió tomarse en consideración la negligencia de la demandante y reducirse su indemnización en proporción a ella. Modificaría la sentencia para, comparando negligencias, reducir en un sesenta por ciento las indemnizaciones concedidas y, así modificada, la confirmaría.